E-FILED
Wednesday, 12 May, 2010  04:18:51 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| VILLAGE OF DEPUE, ILLINOIS, *a Municipal Corporation*, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No.  08-cv-1272 |
| | ) | 08-cv-1273 |
| VIACOM INTERNATIONAL, INC. n/k/a/ CBS OPERATIONS, INC., and EXXON MOBIL CORPORATION, | ) ) ) ) | |
| Defendants. | | |

## O P I N I O N  &  O R D E R

This matter is before the Court on Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint and to Strike Damages Allegations.  (Doc. 32). Plaintiff has responded in opposition to the Motion. (Doc. 38).  On April 9, 2010, the Court found that a Reply Memorandum from Defendants would be helpful, and therefore instructed Defendants to file a Reply, which Defendants did on April 30, 2010.  (Doc. 42).  In addition, Plaintiff's Motion for Leave to File Supplemental Memorandum is also pending; this motion is denied.[1]  (Doc. 41).  For the reasons stated below, the Motion to Dismiss is granted.

---

[1]   The Court directed a Reply from Defendants in order to give Defendants an opportunity to respond to the arguments made by Plaintiff in its Response; it did not seek supplemental briefing from Plaintiff on the issue of a municipality's sovereign immunity from statutes of limitations.  Plaintiff filed its Motion for Leave to File, with the attached supplemental brief, prior to the deadline for Defendants' Reply.  Plaintiff asserts that "[t]here are additional authorities on the subject which plaintiff has found that should be brought to the court's attention."  (Doc. 41 at 1). The Court does not find that Plaintiff's supplemental brief is necessary, as Plaintiff

## BACKGROUND

The background of this case is extensively reviewed in the Court's July 8, 2009 Amended Opinion & Order, and this summary draws on that review. (Doc. 27). Defendants' corporate predecessors operated a zinc smelting facility and a diammonium phosphate fertilizer plant on a particular location ("Site") within the Village of DePue, Illinois, from 1903 until 1989. These operations left the Site with elevated levels of cadmium, lead, and other metals, which the United States Environmental Protection Agency ("EPA") and Illinois Environmental Protection Agency ("IEPA") began to investigate in 1992. Also in 1992, the IEPA began filing Fact Sheets about the Site, some of which have been filed with the Court by the parties as Exhibits in this case and in previous litigation over the Site, and which are also available at http://www.epa.state.il.us/community-relations/fact-sheets/new-jersey-zinc/index.html.[2] A map of the Site is included in Fact Sheet #3, available at http://www.epa.state.il.us/community-relations/fact-sheets/new-jersey-zinc/new-jersey-zinc-3.html.

---

has already had the opportunity to respond to the arguments made by Defendants in their Motion to Dismiss.

[2]   Courts may judicially notice the reports of administrative bodies and documents contained in the public record. *Menominee Indian Tribe of Wis. v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998). These Fact Sheets are published by the IEPA, an Illinois administrative body.
      In 2009, the Judicial Conference of the United States issued guidelines recommending that the Court preserve a "snapshot" of webpages cited in opinions, especially if the information on the webpages is not published elsewhere or the webpages are likely to change over time. All of these IEPA Fact Sheets are available through the IEPA, and several pertinent ones are provided by both Plaintiff and Defendant as Exhibits filed in this case. However, the Court will attach to this Opinion the specific Fact Sheets cited in the Opinion.

In 1995, the Illinois Attorney General filed a suit based on the contamination against Defendants' corporate predecessors in Illinois circuit court, and later entered into an interim consent order with Defendants.[3] The Seventh Circuit described the requirements of the Consent Order:

> Under this Consent Order, [Defendants] must perform a phased investigation of the site and implement certain interim remedies. [They] also must propose final remedies to the State of Illinois before completing final remedial action for the site. The Consent Order requires [Defendants] to perform . . . investigations and remedial actions in compliance with both the ICP (Illinois Hazardous Substances Pollution Contingency Plan) and the NCP (National Oil and Hazardous Substances Pollution Contingency Plan). The State of Illinois, in consultation with the EPA, has sole discretion to decide if the final remedies proposed by [Defendants] are appropriate. The activities completed under the Consent Order are subject to approval by the State of Illinois.

*Village of DePue v. Exxon Mobil Corp.*, 537 F.3d 775, 780 (7th Cir. 2008) (internal citations and quotation omitted).[4] Defendants are currently in the investigatory stage of the cleanup process under the Consent Order, and are in full compliance with it. In addition, the EPA added the Site to the National Priorities List in 1999.

In August 2006, Plaintiff attempted to compel Defendants to perform an immediate cleanup of the Site through a local nuisance ordinance. In October 2006, Plaintiff brought suit against Defendants under the ordinance in Illinois circuit

---

[3]  Judicial notice of the Consent Order is appropriate here, as its terms are not subject to reasonable dispute. *See GE Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1081-82 (7th Cir. 1997) (collecting cases). The Consent Order was filed in this case as an Exhibit to Defendants' first Motion to Dismiss. (Doc. 21, Ex. B).

[4]  Federal courts may take judicial notice of previous judicial decisions. *Consolidation Coal Co. v. United Mine Workers of Am., Dist. 12, Local Union 1545*, 213 F.3d 404, 407 (7th Cir. 2000); *Opoka v. I.N.S.*, 94 F.3d 392, 394-95 (7th Cir. 1996); *see Limestone Dev. Corp. v. Village of Lemont*, 473 F. Supp.2d 858, 868 (N.D. Ill. 2007).

court, and Defendants removed the suit to this Court. This Court granted the Defendants' motion to dismiss, finding that Plaintiff's claims were preempted by federal and state law. *Village of DePue v. Exxon Mobil Corp.*, 06-1266, 2007 WL 1438581 (C.D. Ill. May 15, 2007). On appeal, the Seventh Circuit affirmed this Court's dismissal, based on state law preemption, relying primarily on the fact that Plaintiff was at that time a non-home-rule municipality. *Village of DePue*, 537 F.3d at 780.

On September 8, 2008, Plaintiff enacted a new ordinance against hazardous waste, and on November 4, 2008, Plaintiff became a home-rule municipality under the Illinois constitution. Plaintiff brought new suits in Illinois circuit court, making the same claims against each Defendant based on the new ordinance; Defendants against removed the cases to this Court, where they were consolidated and Plaintiff added common law claims of nuisance and trespass. This Court dismissed Plaintiff's claims based on the new ordinance with prejudice, finding that the ordinance was an invalid exercise of home-rule authority under the Illinois constitution. Plaintiff's common law trespass and nuisance claims were dismissed without prejudice, and Plaintiff was granted leave to amend them. (Doc. 27). Plaintiff filed its Second Amended Complaint on July 27, 2009, re-alleging its trespass and nuisance claims under Illinois law against Defendants. (Doc. 28). Defendants' instant Motion to Dismiss followed. (Doc. 32).

## LEGAL STANDARD

"In ruling on Rule 12(b)(6) motions, the court must treat all well-pleaded allegations as true and draw all inferences in favor of the non-moving party." *In re*

*marchFIRST Inc.*, 589 F.3d 901, 904 (7th Cir. Dec. 21, 2009) (*citing Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir.2008)). To survive a motion to dismiss under 12(b)(6), a plaintiff's complaint must "plead some facts that suggest a right to relief that is beyond the 'speculative level.'" *EEOC v. Concentra Health Svcs., Inc.*, 496 F.3d 773, 776-77 (7th Cir. 2007) (*citing Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 560-63 (2007)). Though detailed factual allegations are not needed, a "formulaic recitation of a cause of action's elements will not do." *Twombly*, 550 U.S. at 547. "The complaint must contain 'enough facts to state a claim to relief that is plausible on its face' and also must state sufficient facts to raise a plaintiff's right to relief above the speculative level." *Bissessur v. Indiana University Bd. of Trustees*, 581 F.3d 599, 602 (7th Cir. 2009) (*quoting Twombly*, 550 U.S. at 557; *Tamayo*, 526 F.3d at 1084). "A claim has facial plausibility 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (*quoting Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009)).

## DISCUSSION

Plaintiff claims that Defendants are liable to it for trespass, by allowing contaminants from the Site to flow onto Village land, and for both public and private nuisance relating to the contamination of Village land. (Doc. 28). The Village land in question is primarily the portion of DePue Lake owned by the Village, though Plaintiff also notes its ownership of the streets and a decline in

business revenue and Village property values. (Doc. 28 at 14, 18-19).[5] Defendants argue that there are three reasons that the Second Amended Complaint should be dismissed: (1) Plaintiff's claims are time-barred, (2) the doctrine of res judicata prevents assertion of Plaintiff's instant claims as they could have been brought in *DePue I*, and (3) the Second Amended Complaint's allegations are insufficient to state claims for nuisance or trespass. In addition, Defendants argue that Plaintiff's damages allegations should be stricken, as they fail to state a claim for which damages are available. (Doc. 33). The Court finds that Plaintiff's claims are time-barred, and therefore need not address Defendants' other arguments.

Initially, it must be noted that Plaintiff claims two distinct sets of activities to underlie its claims of nuisance and trespass. First, Plaintiff claims that Defendants are liable for the conduct of their corporate predecessors, prior to 1989, in creating the accumulation of contaminants at the Site. (Doc. 28 at 13-14, 16). Plaintiff also claims that Defendants are liable for their "ownership and occupation" of the Site." (Doc. 28 at 15-17). As noted by the Court in its July 8, 2009 Amended Opinion & Order, "the Site's mere existence, absent some specific unreasonable conduct by Defendants, is not a proper basis for a nuisance claim." (Doc. 27 at 18). Likewise, merely owning a piece of contaminated land is not alone enough, since such "conduct" does not cause the nuisance or trespass - the alleged injuries would occur whether or not Defendants owned the Site. Therefore, Plaintiff's claims must

---

[5] The page numbering of several of Plaintiff's documents does not square with the page numbers assigned by the electronic filing system when the case was e-filed. For clarity, the Court will refer to page numbers in all documents by the page numbers assigned by the electronic filing system, not those put on the pages by Plaintiff.

result from the actions of Defendants' corporate predecessors in accumulating the contaminants on the Site.

Plaintiff claims four sets of damages from the alleged trespass and nuisance: a diminution in the assessed property values within the Village, resulting in lower tax receipts for the Village; a "loss of business opportunity and loss of revenue for utilizing its once pristine lake as fishing community;" the "cost of remediating the lithopone ridges to cease continuing runoff of heave metal toxicants;" and the "costs of remediating Lake DePue." (Doc. 28 at 18). Plaintiff asserts that these damages are "in excess of…$20 million." (Doc. 28 at 21). Plaintiff also claims punitive damages, which it calculates in the amount of one billion dollars against each Defendant. (Doc. 28 at 21).

Illinois law provides for a five-year statute of limitations on nuisance and trespass claims.[6] 735 ILL. COMP. STAT. 5/13-205. Plaintiff's suit was filed on August 10, 2008, and Plaintiff does not allege any tortious conduct by Defendants since 1989. Thus, Plaintiff's claim is facially barred by the statute of limitations, so the Court must look to whether the continuing tort doctrine, discovery rule, or sovereign immunity prevent dismissal.

---

[6] The Court notes that the original state court action, which was filed on August 10, 2003, did not contains claims for nuisance or trespass, but relied only on the new Village ordinance. (Doc. 1). It was not until the December 12, 2008 Amended Complaint that the nuisance and trespass claims were added. (Doc. 15). As neither party has addressed whether these later claims relate back to the August 10, 2008 Complaint, the Court will assume, without deciding, that they would relate back and that August 10, 2008 is the appropriate date to consider as the date of suit. Given the Court's disposition of the Motion to Dismiss, it does not matter.

I.  **Continuing Tort Doctrine**

Plaintiff argues that the continuing tort doctrine should apply to this case, such that the statute of limitations would not bar the nuisance and trespass actions. On the contrary, a continuing tort "is occasioned by continuing unlawful *acts* and *conduct*, not by continual ill effects from an initial violation." *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 85 (Ill. 2003) (*citing Pavlik v. Kornhaber*, 761 N.E.2d 175, 186-87; *Bank of Ravenswood v. City of Chicago*, 717 N.E.2d 478, 484; *Hyon Waste Mgmt. Serv., Inc. v. City of Chicago*, 574 N.E.2d 129, 133 (Ill. App. 1991)) (emphasis added). *See also Hyon*, 574 N.E.2d at 132-33) (*citing Ward v. Caulk*, 650 F.2d 1144 (9th Cir. 1981)). In cases where the tortious activity ceased at a certain date, the courts do not apply the continuing tort doctrine because to do so would be "to confuse the concept of a continuing tort with that of a continuing injury." *Powell v. City of Danville*, 625 N.E.2d 830, 831 (1993). Here, as noted above, the last possible tortious conduct ceased in 1989, when the operation of manufacturing facilities at the Site ended. Plaintiff alleges that it is continually re-injured by water flowing from the Site onto its property. Plaintiff does not allege that Defendants or their corporate predecessors engaged in any conduct aside from merely owning the Site after that date; the continuing tort doctrine therefore does not apply, as the last allegedly tortious conduct occurred in 1989. *See also Muniz v. Rexnord Corp.*, 04-c-2405, 2006 WL 1519571, *4-5 (N.D. Ill. May 26, 2006) (continuing tort doctrine did not apply where defendant stopped polluting in 1980, though plaintiffs suffered effects of polluted water until 2003); *Soo Line R. Co. v. Tang Industries, Inc.*, 998

F.Supp. 889, 896-97 (N.D. Ill. 1998) (continuing tort doctrine did not apply where defendant ceased toxic dumping in 1982, though plaintiff continued to be harmed).

## II.  Discovery Rule

Illinois follows the discovery rule, which starts the limitations period at the point when the plaintiff "becomes possessed of sufficient information concerning its injury to put a reasonable person on inquiry to determine whether actionable conduct is involved."[7]  *Vector-Springfield Properties, Ltd. v. Central Illinois Light Co.*, 108 F.3d 806, 809 (7th Cir. 1997) (*citing Jackson Jordan, Inc. v. Leydig, Voit & Mayer*, 633 N.E.2d 627, 630-631 (Ill. 1994); *Knox College v. Celotex Corp.*, 430 N.E.2d 976, 980-981 (Ill. 1981); *Abramson v. Abramson*, 772 F.Supp. 395, 397-98 (N.D. Ill.1991)).  "[T]he statute starts to run when a person knows or reasonably should know of his injury and also knows or reasonably should know that it was wrongfully caused." *Id*. (*quoting Knox College*, 430 N.E.2d at 980).  As noted above, Plaintiff's suit was filed on August 10, 2008, so in order for the statute of limitations to bar the instant claims, it must be shown that the injury was or should have been discovered before August 10, 2003.

---

[7]  Plaintiff points out that the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) provides for the application of state statutes of limitations to state-law actions "caused or contributed to by exposure to any hazardous substance, or pollutant or contaminant, released into the environment from a facility," but provides that the limitations period can begin no earlier than "the date the plaintiff knew (or reasonably should have known) that the…property damages…were caused or contributed to by the hazardous substance or pollutant or contaminant concerned."  42 U.S.C. § 9658.  As Illinois also follows this "discovery rule," Illinois law would not place the starting date any earlier than would CERCLA, and so there is no need to resort to federal law to determine the beginning of the limitations period.

9

The Illinois discovery rule does not make Plaintiff's claims timely. Plaintiff claims that the "discovery rule would lend [Defendants] no aid," as it "relied [on] the statement in the [May 1999] Fact Sheet that there was no short term risk to health," which "has been superseded by the July, 2009 Fact Sheet." (Doc. 38 at 12). Though Plaintiff's argument on this point is not well-developed, it appears to argue that, because it did not know the extent of harm caused by the Site contamination until sometime in 2009, the limitations period did not begin until at least 2009.

Plaintiff's discovery rule argument is unavailing, as it knew or should have known of the injury to its property well prior to August 10, 2003. As outlined above, 1992 marked the first investigations of the Site contamination by both the EPA and the IEPA. As early as October 1992, the IEPA's Fact Sheet #1 stated that elevated levels of cadmium, copper, mercury, selenium, zinc, and ammonia were present in DePue Lake. IEPA, New Jersey Zinc/Mobil Chemical Site, Fact Sheet #1, October 1992. At that time, the IEPA noted that these metals could cause chronic health problems with long term exposure. *Id*. In September 1995, the IEPA noted in Fact Sheet #3 that "[w]ater containing elevated levels of metals is discharging into DePue Lake via a ditch south of the site [the "South Ditch"] and occasionally flowing over the sidewalk along Marquette Street." IEPA, New Jersey Zinc/Mobil Chemical Site, Fact Sheet #3, September 1995. The health consequences, for both people and animals, of the heavy metals in the South Ditch were strongly stated in the September 2002 Fact Sheet. IEPA, New Jersey Zinc/Mobil Chemical Site, Fact Sheet #7, September 2002. This Fact Sheet also noted that DePue Lake receives

10

the discharge from the South Ditch, and thus that the Lake and the animals living in and around it would be affected by the contaminants in the South Ditch. *Id.*

These Fact Sheets served to put Plaintiff "on inquiry to determine whether actionable conduct is involved." *Vector-Springfield Properties, Ltd.*, 108 F.3d at 809. In 1992, Plaintiff knew that elevated levels of certain contaminants were present at the Site, and that these contaminants could cause health problems; Plaintiff also knew that the source of the contaminants was the industrial operation at the Site. In 1995, Plaintiff knew that contaminated water from the Site discharged into DePue Lake and over a Village street, and in 2002, it was confirmed that the water thus discharged into the Lake contained sediments that were very harmful to people and animals.[8]  Plaintiff cannot now claim that this information was insufficient to put it on notice of a potential injury to its property. There is no factual dispute that well before August 10, 2003, Plaintiff was on notice that there was a potential risk to health and that contaminated water was flowing onto Village property; the fact that it obtained more detailed information in 2009 does not negate this knowledge.

### III.   Sovereign Immunity

Finally, Plaintiff argues that it has, as a municipality, sovereign immunity from the application of the statute of limitations. Governmental entities are immune from statutes of limitations when they act in their public capacity, but are not immune if they act in a private capacity. *Champaign County Forest Preserve*

---

[8]   The Consent Order itself, issued in 1995, details the results of early testing of both the Site and off-site properties. (Consent Order at 20-24 (Doc. 21, Ex. B at 18-20)).

11

*Dist. v. King*, 683 N.E.2d 980, 982 (Ill. App. 1997) (*citing City of Shelbyville v. Shelbyville Restorium, Inc.*, 451 N.E.2d 874, 877-78 (Ill. 1983); *Board of Education v. A, C & S, Inc.*, 546 N.E.2d 580, 600-02 (Ill. App. 1989)).

> In order to determine if a governmental activity is public or private, courts should consider who would benefit by the government's action and who would lose by its inaction. Three factors must be addressed: (1) the effect of the interest on the public, (2) the obligation of the governmental unit to act on behalf of the public, and (3) the extent to which the expenditure of public revenues is necessitated.

*Champaign County*, 683 N.E.2d at 982 (*citing A, C and S, Inc.*, 546 N.E.2d at 602; *Shelbyville*, 451 N.E.2d at 877-78). The fact that the residents of a particular municipality would benefit from the action is not alone sufficient to render it "public" in nature; the right must belong "to the general public," rather than "only to the government or some small, distinct subsection of the public at large." *Id.* at 984 (*citing Shelbyville*, 451 N.E.2d at 876-77; *People ex rel. Department of Transportation v. Molter*, 478 N.E.2d 1102, 1104 (Ill. App. 1985)). *See also Savoie v. Town of Bourbonnais*, 90 N.E.2d 645, 649 (Ill. App. 1950) ("[P]ublic rights or uses are those in which the public has an interest in common with the people of such municipality, whereas private rights or uses are those which the inhabitants of a local district enjoy exclusively, and the public has no interest therein."). Each of the *Champaign County* factors is considered in turn.[9]

---

[9]   Though it is linguistically appealing to equate a common law "public nuisance" with the vindication of a "public right," such that claims for public nuisance by governmental entities are never subject to the statute of limitations, the court in *City of Chicago v. Latronica*, which considered a public nuisance claim, proceeded to analyze the three factors listed above, though it also found that a public nuisance claim had been adequately stated. 805 N.E.2d 281, 288-89 (Ill. App. 2004).

12

A.     **Effect of the interest on the public**

In *Champaign County*, the court distinguished the cases of *Shelbyville* and *A, C & S*, explaining that in each of those cases the municipal plaintiff sought to recover costs incurred in repairing streets and abating asbestos, respectively. 683 N.E.2d at 982-83. In *Shelbyville*, the city sought to recover the money from a builder who had failed to construct streets, which action "directly affected the safety of the general public." *Champaign County*, 683 N.E.2d at 983 (*citing Shelbyville*, 451 N.E.2d at 877-78). Likewise, in *A, C & S*, school districts sought to recover from asbestos suppliers and distributors the costs they had incurred in abating the asbestos, which affected the general public "because the school districts were addressing a significant health concern." *Id*. (*citing A, C & S*, 546 N.E.2d at 602). In this case, as in *Champaign County*, Plaintiff's suit will have no effect on the general public, as it will neither "make the public safer, nor [will] it reduce the likelihood of injury on plaintiff's property." *Id*.

First, *Champaign County* makes clear that lost potential tax and business revenues, in and of themselves, are not damages that are part of a "public" cause of action, as they do not implicate the public's interest in health and safety, and merely affect the economic interests of the residents of the Village. In addition, though Plaintiff tries to cast its action as one involving the health and safety of Village residents, its recovery of damages purportedly for cleanup costs in this case will not affect public safety, as the cleanup and remediation of the Site are

13

controlled by the IEPA and the Consent Order.[10]  Plaintiff has no authority to pursue remediation of the Site itself, which is still owned by Defendants and the remediation of which is controlled by the Consent Order.  Therefore, Plaintiff cannot recover, in order to improve public health and safety, for "the cost of remediating the lithopone ridges [which are on the Site] to cease continuing runoff of heavy metal toxicants."  (Doc. 28 at 18).

Further, the Consent Order explicitly provides that Defendants and the IEPA are to develop a plan to prevent further runoff of contaminated water from the Site, including into the Lake, which is a necessary first step to any cleanup efforts; Defendants and the IEPA are also to investigate and develop potential remedies for "contamination…in any area…impacted by the releases [of contaminants from the Site], which necessarily includes the Lake."  (Consent Order, Attachment 1 at 2 (Doc. 21, Ex. B at 61); Consent Order at 6-7 (Doc. 21, Ex. B at 11)).  Therefore, the recovery by Plaintiff of the "cost of remediating Lake DePue of its heavy metal contaminants" will not improve public health and safety, as Plaintiff has not, and cannot, undertake this task itself.[11]  (Doc. 28 at 18).  *Cf. City of Chicago v.*

---

[10]  Plaintiff claims that it is not "bound" by the Consent Order, citing to the "Non-Party Injury or Damages" clause of the Consent Order. (Consent Order at 82 (Doc. 21, Ex. B at 49)).  While it is true that Plaintiff is not bound to any action by the Consent Order, and that the Consent Order itself does not limit Plaintiff's remedies, the Consent Order does show which parties are responsible for the remediation of the Site and of contamination from it.

[11]  The Court also notes the commonsensical observation that Plaintiff's efforts to remediate the Lake before the Site's IEPA-controlled remediation is complete would be ineffective, as water would continue to flow from the Site to the Lake.  In addition, Plaintiff owns only 20 acres of the over 600-acre Lake, and does not explain how an attempted remediation of a mere 3.3% of the Lake would be effective or improve public health and safety.  (Doc. 28 at 12).

*Latronica*, 805 N.E.2d 281, 288-89 (Ill. App. 2004) (city had purchased relevant site and so could and did undertake remediation); *A, C & S*, 546 N.E.2d at 602 (school buildings from which asbestos to be removed owned by school district plaintiffs); *Shelbyville*, 451 N.E.2d at 877-78 (city owned streets to be repaired).  This first factor turns against Plaintiff's position that the statute of limitations does not apply.

      B.      **Plaintiff's obligation to act on behalf of the public**

Further, *Champaign County* explains that "whether the governmental entity was obligated to act on behalf of the public" must be addressed in determining whether an action is public or private.  *Id*. at 983.  This factor turns on whether there is an obligation in law for the governmental entity to undertake the action for which it seeks to recoup its costs.  Here, Plaintiff does not point to, and the Court cannot identify, any source of legal obligation for Plaintiff either to maximize potential tax and business revenues, or to perform environmental cleanup of DePue Lake or other Village property, especially where the Consent Order covers such cleanup.

In each of the Illinois cases cited to the Court in which a governmental entity was immune from the statute of limitations, the governmental entity had a legal obligation to undertake the action for which it sought to recover its costs.  In

---

Fact Sheet #10 reveals that Defendants and the IEPA are working together with the Illinois Department of Natural Resources and federal agencies to design a remedy for DePue Lake contamination, and that Defendants and the IEPA will negotiate the implementation of the remedy.  Defendants and the IEPA are also working on testing off-site soils, and "have agreed to work toward an immediate remedy for affected properties" that require immediate soil removal.  IEPA, New Jersey Zinc/Mobil Chemical Site, Fact Sheet #10, December 2004.  These facts indicate the scope of remediation work under the Consent Order.

*Shelbyville*, a city ordinance required that the city bear no part of the cost of constructing the streets at issue, which were to be constructed as part of a subdivision, while an Illinois statute required the city to "ensure [the] construction and maintenance" of city streets. *Shelbyville*, 451 N.E.2d at 878. In *A, C & S*, the Illinois Asbestos Abatement Act required the school districts to remove asbestos-containing materials from schools. *A, C & S*, 546 N.E.2d at 602. Similarly, in *Latronica*, the city of Chicago was "authorized and obligated by law to clean up the Site" under the municipal code. *Latronica*, 805 N.E.2d at 288-89. On the other hand, in *Champaign County*, the court found that there was no legal obligation to undertake the relevant action, and so the suits to recover the governmental entities' costs were subject to the statute of limitations. *Champaign County*, 683 N.E. at 983 (though municipality "authorized to purchase insurance, it was not required to do so" under statute). *See also People ex rel. Ill. Dept. of Labor v. Tri State Tours, Inc.*, 795 N.E.2d 990, 994 (Ill. App. 2003) (*citing People ex rel. Hartigan v. Agri-Chain Products, Inc.*, 586 N.E.2d 535 (1991); *Stafford v. Bowling*, 407 N.E.2d 771 (1980)) (no immunity where governmental entity had option, but no legal duty to act).

Here, as in *Champaign County*, there is no legal obligation on the part of the Village to maximize potential tax and business revenues by ensuring that land within the Village is pristine. Likewise, there is no legal obligation for the Village to undertake remediation of the Site; indeed, the State of Illinois has placed this burden on Defendants. Further, there is no legal obligation for the Village to undertake a cleanup of non-Site contaminated property. Though the Village might

16

wish, as a landowner, to undertake such efforts, it is not legally obligated to do so and therefore is not asserting a right of the general public.

### C. Extent of necessary public expenditure

Finally, as explained in *Champaign County*, the public interest at stake must necessitate an expenditure of public revenues, though the fact that public funds have been used is not dispositive of whether the activity is public. *Champaign County*, 683 N.E.2d at 983-84 ("[T]he fact that public funds were used…does not necessarily render it a public act. Otherwise, any use of public funds would always be considered a public act"). The *Champaign County* court noted that in both *Shelbyville* and *A, C & S*, the governmental entities had spent highly burdensome amounts of money on the required actions they had undertaken. *Champaign County*, 683 N.E.2d at 202 (*citing Shelbyville*, 451 N.E.2d 874; *A, C & S*, 546 N.E.2d 580. In *Latronica*, the city had already spent millions on the cleanup of a polluted site that it had purchased. *Latronica*, 805 N.E.2d at 290.

As noted above, in *Shelbyville*, *A, C & S*, and *Latronica*, the governmental entities were required by law to undertake these expenditures and were thus entitled to recover; here, there is no obligation on the part of Plaintiff to maximize potential tax or business revenue, or to clean up pollution caused by releases from the Site. In addition, Plaintiff does not allege what costs it has been forced to incur in dealing with pollution from the Site, other than to allege that it has lost potential tax and business revenues from declining property values and tourism, and that the cost of remediation "is believed to be in the multiple millions of dollars." (Doc. 28 at 18). As Plaintiff is not required by law to undertake the actions that these damages

seek recovery for, no expenditure of public funds has been necessitated by the contamination from the Site. Indeed, the Consent Order requires Defendants to assume the costs of remediation at and around the Site.

As the application of the three factors from *Champaign County* demonstrate, Plaintiff's nuisance and trespass claims are not brought in Plaintiff's "public" capacity, but are brought solely to recover damages allegedly incurred because of Plaintiff's interests as a private landowner; sovereign immunity against the application of statutes of limitation thus does not apply here. Notably, in none of the precedential Illinois cases cited to the Court had a state agency already established working relationship with the defendants to deal with the problems the plaintiff sought to address by its suit. The purpose of sovereign immunity from statutes of limitations for public actions is to protect the public from "the negligence of its officers and agents in failing to promptly assert causes of action which belong to the public," thereby leaving the public without a remedy. *A, C & S*, 546 N.E.2d at 601 (*citing Shelbyville*, 451 N.E.2d at 876). Here, where Defendants are already bound to address and pay for the remediation of contamination from the Site under the Consent Order, there is little need for Plaintiff's action or for the application of sovereign immunity from the statute of limitations. In addition, neither the discovery rule nor the continuing tort doctrine mitigate the effect of the statute of limitations in this case. Therefore, Plaintiff's claim is barred by the five-year statute of limitations applicable to nuisance and trespass actions.

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss (Doc. 32) is GRANTED. This matter is DISMISSED WITH PREJUDICE. Plaintiff's Motion for Leave to File Supplemental Memorandum (Doc. 41) is DENIED.

IT IS SO ORDERED.

CASE TERMINATED.


Entered this <u>12th</u> day of May, 2010.


                                                  s/ Joe B. McDade
                                                JOE BILLY McDADE
                                     United States Senior District Judge